CHARLES B.,

           Plaintiff,

      v.

ANDREW M. SAUL,
Commissioner of Social Security,

           Defendant.

Case No. 18 C 1377

Magistrate Judge Sunil R. Harjani

## MEMORANDUM OPINION AND ORDER

Plaintiff Charles B.[1] seeks judicial review of the final decision of Andrew M. Saul, Commissioner of Social Security, denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. Charles moves for a reversal of the ALJ's decision and an award of benefits, or alternatively, a remand, while the Commissioner asks for affirmance of the ALJ's decision to deny benefits. For the reasons stated below, the ALJ's decision is reversed and this case is remanded for further proceedings consistent with this opinion.

## I. BACKGOUND

Charles graduated high school and previously worked as a loader, packer, and school bus driver. (R. 39, 54, 69). The medical record indicates that Charles has long suffered from neck and back impairments. Charles originally injured his back in 1999 while lifting heavy boxes at work. *Id.* at 43, 794. Since then, he has undergone three surgeries on his neck and four surgeries on his back. *Id.* at 51. Charles received benefits for a closed period between December 15, 2007 and June 2, 2010 following a work-related injury to his cervical spine in

---

[1]      Pursuant to Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff as "Charles B." or "Charles."

late 2007 which resulted in a large disc herniation at C2-C3 and a smaller herniation at C3-C4. *Id.* at 92-103. Charles testified that he has eighteen screws, nine spacers, two rods, four hinges, and eighteen nuts in his neck. *Id.* Four screws, two rods, and four nuts had to removed from his back when he was having back pain. *Id.* Charles uses a cane or walker when ambulating. *Id.* at 60. Charles last worked in November 2014 as a school bus driver when he alleges that symptoms from severely herniated C5, C6, and C7 discs in his neck forced him to stop working. *Id.* at 54-56.

Charles filed an application for DIB on July 25, 2014, alleging he became disabled on November 24, 2014 due to depression, anxiety, high blood pressure, sleep apnea, chronic pain, and spinal fusion. (R. 225-26, 244). Charles is also morbidly obese: he is 6'5" and in 2017 weighed as much as 377 pounds with a body mass index of 44.7. *Id.* at 839. Charles's DIB application was initially denied on December 1, 2015, and upon reconsideration on April 12, 2016, after which he requested an administrative hearing. *Id.* at 104-29, 150-51. On September 12, 2017, Charles, represented by counsel, appeared and testified at a hearing before ALJ Matthew Johnson. *Id.* at 34-81. The ALJ also heard testimony from vocational expert ("VE") Pamela Tucker. *Id.* at 69-79.

On October 4, 2017, the ALJ issued a decision denying Charles's application for DIB. (R. 16-28). The opinion followed the required five-step evaluation process. 20 C.F.R. § 404.1520. At step one, the ALJ found that Charles had not engaged in substantial gainful activity since November 24, 2014, his alleged onset date. *Id.* at 18. At step two, the ALJ found that Charles had the severe impairments of obesity, spine disorder status post cervical fusion, and degenerative disc disease. *Id.* The ALJ found Charles's hypertension, sleep apnea, gastroesophageal reflux disease, and depression and anxiety to be non-severe. *Id.* at 18-19. At

step three, the ALJ determined that Charles did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). *Id*. at 20.

The ALJ then concluded that Charles retained the residual functional capacity ("RFC") to perform sedentary work[2] as defined in 20 C.F.R. § 404.1567(a), except that:

> he can handle items frequently with the left hand or the right hand. He can perform fingering on a frequent basis with the left hand or the right hand. He cannot climb ladders, ropes, or scaffolds or kneel. He can occasionally climb ramps or stairs, balance, stoop, crouch, or crawl. He can frequently work in hazardous environments such as around unprotected heights; with moving mechanical parts; or operate a motor vehicle. He can assume no position for longer than thirty minutes. If he does sit, stand, or walk for thirty minutes at one time, he must be allowed to assume a different position for five minutes before resuming the prior position without abandoning his workstation or losing concentration on his assigned work duties. He is limited to being allowed to use an assisted device up to 100% of the time for balance and/or ambulation.

(R. 21). Based on this RFC, the ALJ determined at step four that Charles could not perform his past relevant work as a loader and a packer. *Id*. at 26. At step five, the ALJ found that there were jobs that exist in significant numbers in the national economy that Charles could perform. *Id*. at 26-27. Specifically, the ALJ found Charles could work as a circuit board assembler, document preparer, and circuit board inspector. *Id*. at 27. Because of this determination, the ALJ found that Charles was not disabled. *Id*. The Appeals Council denied Charles's request for review on February 18, 2018, leaving the ALJ's decision as the final decision of the Commissioner. *Id*. at 1-6; *McHenry v. Berryhill,* 911 F.3d 866, 871 (7th Cir. 2018).

---

[2] Sedentary work involves lifting no more than 10 pounds at a time and the ability to sit for six hours in an eight-hour workday and stand or walk no more than about two hours of an eight-hour workday. SSR 83-10, 1983 WL 31251, at *5 (1983).

## II. DISCUSSION

Under the Social Security Act, a person is disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine disability within the meaning of the Social Security Act, the ALJ conducts a sequential five-step inquiry, asking: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the claimant's impairment meet or equal an impairment specifically listed in the regulations? (4) Is the claimant unable to perform a former occupation? and (5) Is the claimant unable to perform any other work in the national economy? *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992); *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985); 20 C.F.R. § 404.1520(a)(4). "An affirmative answer leads either to the next step, or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski*, 760 F.2d at 162 n.2.

Judicial review of the ALJ's decision is limited to determining whether it adequately discusses the issues and is based upon substantial evidence and the proper legal criteria. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). In reviewing an ALJ's decision, the Court may "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Although the Court reviews the ALJ's decision deferentially,

the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and his conclusions. *See Steele v. Barnhart*, 290 F.3d 936, 938, 941 (7th Cir. 2002) (internal citation and quotations omitted). When the ALJ's "decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Id*. at 940.

The ALJ found Charles not disabled at step five of the sequential analysis because he retains the RFC to perform other work that exists in significant numbers in the national economy. Charles asserts that the ALJ committed several reversible errors. First, Charles argues that the ALJ erred at step two by finding that his sleep apnea and depression and anxiety are non-severe impairments. Second, Charles contends that the ALJ mischaracterized the evidence when determining his RFC. Third, Charles argues the ALJ improperly discounted the opinions of his treating physician and surgeon. Fourth, Charles asserts that the ALJ improperly assessed his subjective symptoms statements. The Court agrees that the ALJ improperly assessed Charles's RFC by failing to consider the combined impact of Charles's impairments, mischaracterizing the evidence, and rejecting Charles's treating physician's and surgeon's opinions. Because these errors require remand, the Court need not address Charles's remaining argument that the ALJ's subjective symptom evaluation was patently wrong.

## A.      Non-Severe Impairments

Charles first argues that the ALJ erred in finding that his obstructive sleep apnea and anxiety and depression were non-severe impairments at step two. The ALJ determined that Charles's obstructive sleep apnea was not severe because the state agency physicians opined that Charles's sleep-related breathing disorders were not a severe impairment and "the medical records documented no persistent symptoms of obstructive sleep apnea and few if any complaints of daytime fatigue." (R. 19). The ALJ also concluded that Charles's depression and anxiety were

non-severe because he "gets good benefit and control on his medication regime which consists of only psychotropic medications prescribed by his primary care physician." *Id.* The ALJ noted that Charles takes Duloxetine and Xanax but that he does not see a psychiatrist, psychologist, therapist, or counselor and has not been psychiatrically hospitalized. *Id.* The ALJ then proceeded to consider the four broad areas of mental functioning, also known as the "paragraph B" criteria. The ALJ determined that Charles has: (1) no limitation in understanding, remembering, or applying information; (2) no limitation in interacting with others; (3) mild limitations in concentration, persistence, or pace; and (4) no limitation in adapting or managing oneself. *Id.* at 19-20. The ALJ found Charles's obesity, spine disorder status post cervical fusion, and degenerative disc disease are severe impairments and proceeded to the remaining steps of the five-step sequential evaluation process. *Id.* at 18, 20-28.

At step two, the ALJ determines whether the claimant has a "severe medically determinable physical or mental impairment ... or a combination of impairments that is severe...." 20 C.F.R. § 404.1520(a)(4)(ii). Step two is a threshold step and "[a]s long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluative process." *Castile v. Astrue,* 617 F.3d 923, 926–27 (7th Cir. 2010). Here, the ALJ's failure to find Charles's obstructive sleep apnea and depression and anxiety as a severe impairment at step two is not a reversible error because the ALJ categorized three other impairments as severe and proceeded to step four. *Arnett v. Astrue,* 676 F.3d 586, 591 (7th Cir. 2012) (stating "even if there was a mistake at Step 2, it does not matter. Deciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even *one* severe impairment.") (emphasis in original).

The problem here, however, is that once the ALJ proceeded past step two, he did not consider whether Charles's obstructive sleep apnea and depression and anxiety warranted further limitations to Charles's RFC. *Loftis v. Berryhill*, 2017 WL 2311214, at *2 n.1 (N.D. Ill. May 26, 2017) ("[A]ny error that an ALJ commits at step two is harmless as long as she goes on to consider the combined impact of a claimant's severe and non-severe impairments."). "In determining an individual's RFC, the ALJ must evaluate all limitations that may arise from medically determinable impairments, even those that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Villano*, 556 F.3d at 563; *Murphy v. Colvin*, 759 F.3d 811, 820 (7th Cir. 2014) ("An RFC determination must account for all impairments, even those that are not severe in isolation."). The regulations require the ALJ's RFC analysis to "consider all of your medically determinable impairments of which we are aware" even if they are not severe. 20 C.F.R. § 404.1545(a)(2).

The ALJ did not mention Charles's non-severe impairments after step two of his disability analysis. In determining Charles's RFC, the ALJ stated that he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (R. 21). This statement alone is not sufficient to demonstrate that the ALJ made an assessment of the combined effects of Charles's severe and non-severe impairments where his RFC discussion fails to mention any of Charles' non-severe impairments, including his hypertension, obstructive sleep apnea, GERD, and depression and anxiety. *Smith v. Berryhill*, 2018 WL 4679584, at *5 (N.D. Ill. Sept. 28, 2018). The ALJ did not engage in any explicit discussion of Charles's severe and non-severe impairments in combination. This failure to consider the combined effect of Charles's non-severe impairments together with his other severe impairments warrants reversal. *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010)

("A failure to fully consider the impact of non-severe impairments requires reversal."). On remand, the ALJ shall address the aggregate impact of all of Charles's severe and non-severe impairments when evaluating his RFC. *Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) ("On remand the agency must remember that a competent evaluation of [claimant's] application depends on the total effect of all his medical problems.").

Also absent from the ALJ's RFC analysis is any discussion of his finding that Charles's mental impairments of depression and anxiety resulted in a mild limitation in concentration, persistence, or pace. (R. 21-26). In the Seventh Circuit, "both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). "While a mild, or even a moderate, limitation in an area of mental functioning does not *necessarily* prevent an individual from securing gainful employment, the ALJ must still affirmatively *evaluate* the effect such mild limitations have on the claimant's RFC." *Simon-Leveque v. Colvin*, 229 F.Supp.3d 778, 787 (N.D. Ill. Jan. 17, 2017) (emphasis in original).

The ALJ found at step two that Charles's depression and anxiety are non-severe but nevertheless cause mild limitations in concentration, persistence, or pace. (R. 19-20). The ALJ's step two finding that Charles has mild limitations in concentrating, persisting, or pace does not constitute a mental RFC assessment. As Social Security Ruling 96-8p explains, "[t]he limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *4 (July 2, 1996). "The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph[] B." *Id*. In this case, the ALJ

recognized that his paragraph B discussion at step two was not a substitute for an RFC finding, stating:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders in 12.00 of the Listing of Impairments. (SSR 96-8p).

(R. 20). When determining Charles's RFC, however, the ALJ did not mention Charles's mental impairments, let alone make a "detailed assessment," to determine what, if any, restrictions his limitations in concentration, persistence, or pace placed on his ability to work.

The ALJ concluded his step-two analysis by stating: "Therefore, the following residual functional capacity assessment reflects the degree of limitation I have found in the 'paragraph B' mental function analysis." (R. 20). The ALJ did not include any nonexertional mental limitations in the RFC assessment. *Id*. at 21. "It is unclear what the ALJ meant by saying that the RFC 'reflects' his Step 2 findings concerning [the claimant's] mental limitations." *Muzzarelli v. Astrue*, 2011 WL 5873793, at *23 (N.D. Ill. Nov. 18, 2011). For this reason, numerous courts in this district have "remanded cases where an ALJ relied on language identical to that used at the end of Step 2 in this case because it fails to clarify the degree to which the RFC expresses the functional limitations found under the special technique." *Id*; *Iora P. v. Berryhill*, 2019 WL 1112272, at *4 (N.D. Ill. March 11, 2019); *Jacqueline J. v. Berryhill*, 2019 WL 339588, at *4 (N.D. Ill. Jan. 28, 2019); *see also Alesia v. Astrue*, 789 F.Supp.2d 921, 933 (N.D. Ill. 2011) (holding this same language "was not enough because the combined impact of the impairments must be 'considered throughout the disability determination process.'"). Similarly, in this case, a remand is warranted "because the ALJ failed to explain how his Step 2 discussion of [Charles's] restrictions in

[concentrating, persisting, or maintaining pace] are 'reflected' in the RFC itself." *Muzzarelli*, 2011 WL 5873793, at *23.

The record indicates that Charles's depression and anxiety, medications, and sleep apnea impact his ability to sustain concentration and attention. On November 24, 2015 and April 6, 2016, the Commissioner's psychological examiners diagnosed affective disorder and anxiety disorder and concluded that Charles experiences mild difficulties in maintaining concentration, persistence, or pace. (R. 108-09, 123-24). On August 1, 2016 and September 2, 2016, Dr. Masood diagnosed depression, anxiety, and psychological factors affecting Charles's physical condition. *Id*. at 727, 757. Dr. Masood opined that Charles experiences side effects from his medications, including drowsiness and tiredness, and Charles's pain and other symptoms would constantly interfere with the attention and concentration needed to perform even simple work tasks. *Id*. Charles has also been diagnosed with "severe sleep apnea of both obstructive and central type." *Id*. at 642. At the hearing before the ALJ on September 12, 2017, Charles testified that he takes Duloxetine for his depression and Xanax three times a day for his anxiety. *Id*. at 47. Charles explained that his medications often make him tired and he will nap throughout the day. *Id.* at 66. The ALJ failed to explain why this evidence did not require additional nonexertional limitations to Charles's RFC. Specifically, the ALJ did not explain why Charles's mild limitations in concentration, persistence, or pace were not included in the RFC. This was error. *Muzzarelli*, 2011 WL 5873793, at *23 ("If the ALJ believed that the mild limitations in [concentrating, persisting, or maintaining pace] did not merit a non-exertional limitation in the RFC, he was obligated to explain that conclusion so that we can follow the basis of his reasoning.")*; Hearan v. Berryhill*, 2018 WL 3352657, at *3 (N.D. Ill. July 9, 2018) (ALJ's failure to explain why he did not include the mild limitations in activities of daily living, social functioning, and in maintaining

concentration, persistence, or pace he found into the RFC required remand).

The Court recognizes that the VE testified that Charles could perform the sedentary jobs she identified if he was also limited to understanding, remembering, carrying out, and performing simple, routine tasks involving only simple, work-related decisions, with the ability to adapt only to routine work place changes. (R. 74). Because the numerous errors detailed in this opinion require remand, the Court need not address whether the ALJ's error in failing to include Charles's mild limitation in concentration, persistence, or pace in the RFC is harmless given the VE's testimony in this regard. Nevertheless, for purposes of remand, the Court notes that the Seventh Circuit has said "[a]gain and again" that "when an ALJ finds documented limitations of concentration, persistence, and pace, the hypothetical question presented to the VE must account for these limitations." *Winstead v. Berryhill*, 923 F.3d 472, 476 (7th Cir. 2019). "[T]he most efficient way to ensure that the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical." *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010). The Seventh Circuit has not, however, required the ALJ to use the specific terminology of "concentration, persistence, or pace" in the hypothetical in all cases. *Id*; *see Jozefyk v. Berryhill*, 923 F.3d 492, 498 (7th Cir. 2019) (upholding "generic[]" limitations of "simple, routine, repetitive tasks" "when they adequately account for the claimant's demonstrated psychological symptoms.") *but see also Yurt*, 758 F.3d at 858-59 ("repeatedly reject[ing] the notion that a hypothetical . . . confining the claimant to simple, routine tasks and limited interactions with others adequately capture temperamental deficiencies and limitations in concentration, persistence, and pace."). On remand, the ALJ shall adequately account for Charles's deficiencies in concentration, persistence, or pace in the RFC and the hypothetical to the VE.

**B.     RFC Determination**

Charles next argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ mischaracterized the evidence and erroneously rejected the opinion of his treating physician, Shahid Masood, M.D., and his surgeon, Kern Singh, M.D.  The Court agrees that the ALJ's RFC analysis is flawed because it rests on several mischaracterizations of the record and the ALJ erred in his evaluation of the treating physician's and surgeon's medical opinions.

**1.     Mischaracterizations of the Record**

First, the ALJ mischaracterized several lines of evidence.  "The ALJ must evaluate the record fairly" and "may not ignore an entire line of evidence that is contrary to the ruling." *Golembiewski v. Barnhart*, 322 F.3d at 917.  The ALJ must also build an "accurate and logical bridge" from the evidence to his conclusion regarding a claimant's RFC. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  The ALJ in this case erred in his characterization of the imaging results related to Charles's cervical, thoracic, and lumbar spine.  The ALJ stated that the imaging results were "mild" (R. 24, 26), yet a July 2, 2013 MRI of the cervical spine showed "severe" vertebral canal stenosis at C5-C6 and "moderate" vertebral canal stenosis with "moderate" left foraminal stenosis at C6-C7 (R. 357-58), a December 2014 CT scan of the cervical spine  revealed "mild to moderate" central canal stenosis at C4-5 and C6-7 and "moderate to severe" stenosis at C5-6 (R. 440), a January 14, 2017 MRI of the thoracic spine showed a focal central disc protrusion at T6-7 which produced "moderate" indentation on the anterior aspect of the thecal sac (R. 735), a January 14, 2017 MRI of the cervical spine revealed a left central posterior osteophyte with associated disc protrusion producing "moderate" indentation on the anterior left central aspect of the thecal sac at C6-7 (R. 745-46), and a January 16, 2017 CT scan of the lumbar spine showed "severe" canal narrowing and foraminal narrowing at L3-L4 (R. 803).  These findings contradict the ALJ's

finding that Charles's imaging results were "mild." Because the ALJ significantly mischaracterized the severity of the imaging results of Charles's spine when formulating the RFC, the Court cannot conclude that the ALJ built an "accurate and logical bridge" from the evidence to his conclusion that Charles retained the residual functional capacity to perform a range of sedentary work. *See Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013) (reversing where ALJ in rejecting medical opinion "misunderstood or mischaracterized the results of the MRI" as being "unremarkable" where "those results demonstrated mild to moderate degeneration in one of the discs of Roddy's lower spine as well as tear in the cartilage surrounding that disc"); *Steele*, 290 F.3d at 940 (holding ALJ's step three finding could not stand because the ALJ mischaracterized claimant's EEG results showing seizure episodes and documenting a neurophysiological disturbance as "generally unremarkable" and "unremarkable").

There are other parts of the record which the ALJ mischaracterized when evaluating Charles's RFC and his subjective symptom allegations. For instance, the ALJ stated that "persistent numbness to his upper or lower extremities [is] not support by the medical records." (R. 24). But the medical record shows that Charles repeatedly complained of numbness in his extremities. *See e.g.* (R. 608) (3/6/2014 – reported numbness in fingers); (R. 608) (4/4/2014 – reported numbness in upper extremities); (R. 612) (4/29/2019 – reported numbness in fingers bilaterally); (R 607) (10/2/2014 – stated numbness in hands); (R. 600) (11/24/2014 – complained of numbness in his upper and lower extremities); (R. 598) (12/22/2014 – "[c]omplaint of numbness in upper and lower extremities"); (R. 596) (1/19/2015 – reported "numbness in lower extremities"); (R. 593) (1/29/2015 – post C-spine fusion reported "[n]umbness in upper and lower extremities resolving [but] still have some numbness in upper and lower extremities"); (R. 379) (6/18/2015 – reported "left numbness in his third through fifth digits" and "right upper extremity

numbness in his hand up to his mid forearm"); (R. 606) (7/6/2015 – reported numbness in upper and lower extremities); (R. 397) (8/13/2015 – complained of "persistent numbness in his hands and feet"); (R. 602) (8/29/2015 – reported "numbness in upper extremities"); (R. 665, 691) (1/18/2016 – reported numbness in lower and upper extremities); (R. 662, 688) (2/15/2016) (reported numbness in upper extremities); (R. 718) (4/11/2016 – reported numbness in hands); (R. 715) (5/9/2016) (complained of "numbness in bilateral upper extremities and face numbness and bilateral lower extremities"); (R. 710) (8/1/2016) (complained of "numbness to hands and dropping items"); (R. 850) (9/28/2016 – complained of "increase[d] hand numbness and tingling in the past 2-3 weeks."); (R. 852) (11/26/2016) (complained of numbness in upper and lower extremities); (R. 845) (1/27/2017 – "still having numbness in lower extremities"); (R. 840) (5/18/2017 – reported numbness in upper extremities).

Moreover, Dr. Masood noted on April 11, 2016 that Charles saw his surgeon regarding neck pain that radiates to his upper extremities bilaterally and numbness in his hands and "he was told it would be permanent." (R. 718). On August 1, 2016, Dr. Masood completed a physical residual functional capacity questionnaire in which he listed "numbness and tingling in hands" as one of Charles's symptoms. *Id.* at 756. Dr. Masood completed a second physical residual functional capacity questionnaire on September 2, 2016 and reported that Charles suffered from neck pain and numbness in his upper and lower extremities. *Id*. at 726. Both before and after his January 20, 2017 L3-4 revision laminectomy, Charles reported numbness in his extremities to his surgeon, Dr. Singh. (R. 783) (10/28/2015) (reported intermittent numbness and tingling in both hands); (R. 791, 793) (1/15/2017) (complained of numbness in fingers and toes); (R. 767) (2/1/2017) (reported – bilateral upper extremity numbness and tingling in both hands); (R. 763) (3/23/2017 – reported intermittent numbness and tingling along posterior legs and numbness in

both feet).  After his  L3-4 revision laminectomy, Charles similarly reported numbness, tingling, and weakness in his upper and lower extremities to his physical therapist. *Id*. at 831.  Finally, Charles testified that he experiences "constant" numbness in his arms from his elbows to his hands and in his legs and his surgeon told him that the numbness was permanent. *Id*. at 56.

The ALJ also misrepresented the overall record when he wrote in his decision that "pain medications helped relieve [Charles's] symptoms" by pointing to a single doctor's note from March 16, 2015. (R. 24, 591).  The ALJ's conclusion in this regard ignores more recent evidence that supported Charles's complaints of pain.  While it is true that Charles reported in 2014 and 2015 that pain medications helped control his pain symptoms (R. 591-93, 595, 606, 608-12, 614-15, 667, 670), more recent medical records suggest that Charles's pain worsened and he experienced significant neck and back pain despite the use of strong narcotics.  Medical records from 2016 and 2017 reflect that Charles consistently reported pain levels of seven and eight out of ten while taking Oxycontin and Percocet. (R. 711, 713, 715, 716, 718-20, 839-42, 844-46, 851-52).  At the September 12, 2017 hearing, Charles explained that his pain medication provides limited relief by reducing his pain to a level where he does not have to visit the hospital. (R. 57-58).  Mentioning one older treatment note, while ignoring more recent treatment notes which undermine the ALJ's conclusion, "is precisely the type of cherry-picking of the medical record that [the Seventh Circuit] ha[s] repeatedly forbidden." *Yurt*, 758 F.3d at 859; *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014) ("An ALJ need not mention every piece of medical evidence in her opinion, but she cannot ignore a line of evidence contrary to her conclusion.").  A complete reading of Dr. Masood's treatment notes reflects significant and consistent complaints of neck and back pain despite the use of narcotic painkillers, including Oxycontin and Percocet, and Celebrex and baclofen.  By not considering the full record of Charles's subjective complaints of pain, the

ALJ improperly diminished the severity and persistence of Charles's pain.

Before moving on, the Court notes an additional instance in which the ALJ materially mischaracterized the evidence. When evaluating Charles's testimony that he has fallen several times, the ALJ noted that "the only mention of falls is in the workers' compensation claim. He has not been treated in the emergency room (ER) or had doctor's visits because of falls. He has not suffered any broken bones from falls. Falls are not mentioned in the medical records or the objective medical evidence." (R. 24; 61-65). There are two issues with the ALJ's analysis. First, the ALJ's statement that falls are not mentioned in the medical record or objective medical evidence is factually inaccurate. Contrary to the ALJ's statement, Charles told his physical therapist that on May 30, 2015 "his legs suddenly 'gave out.'" *Id*. at 379. On December 21, 2015, he reported to Dr. Masood that his left leg had given out on him a "few times and he fell." *Id*. at 693. Also, Charles reported to Dr. Masood on February 16, 2015 that his left leg "gave up on him" and on December 20, 2016 that his right knee was "giving out on him sometimes." *Id*. at 601, 846. In his physical RFC questionnaire dated August 1, 2016, Dr. Masood noted that Charles's symptoms include "frequent falls." *Id*. at 756. On January 5, 2017, Charles reported six falls over the past three months to Dr. Singh. *Id*. at 773. On June 18, 2017, Dr. Masood wrote that Charles stated that he was "falling frequently" as his "left knee give[s] out on him." *Id*. at 840. Dr. Masood also noted that Charles saw Dr. Singh who stated that "nothing can be done and he has to live with it." *Id*. Finally, Charles testified that his legs "give out" and he uses a cane or walker when ambulating. *Id*. at 41, 60-61. Indeed, the ALJ addressed Charles's need for a cane or a walker by finding that Charles should be "allowed to use an assisted device up to 100% of the time for balance and/or ambulation." *Id*. at 21. Second, the ALJ places great weight on the fact that did not receive treatment for his falls or suffer any broken bones. The ALJ's reasoning on this point is faulty

because not everyone who falls needs medical treatment or suffers a broken bone. Without more explanation, the Court cannot find that this analysis is supported by substantial evidence.

In sum, the ALJ's RFC and subjective symptom determinations are grounded on several factual mischaracterizations of the record. Thus, the ALJ failed to build a logical and accurate bridge between the evidence and his RFC conclusion. On remand, the ALJ shall reevaluate Charles's RFC and subjective symptom allegations after an accurate and complete consideration of the record.

### 2. Treating Physician's and Surgeon's Opinions

Second, the ALJ also erred in assessing the opinions of Charles's treaters, Drs. Masood and Singh. The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record" 20 C.F.R. § 404.1527(c)(2); *Kaminski v. Berryhill*, 894 F.3d 870, 874 n.1 (7th Cir. 2018) (for claims filed before March 27, 2017, an ALJ "should give controlling weight to the treating physician's opinion as long as it is supported by medical findings and consistent with substantial evidence in the record."). An ALJ must "offer good reasons for discounting a treating physician's opinion." *Campbell v. Astrue,* 627 F.3d 299, 306 (7th Cir. 2010) (citations omitted); *see also Walker v. Berryhill,* 900 F.3d 479, 485 (7th Cir. 2018). Those reasons must be "supported by substantial evidence in the record; a contrary opinion of a non-examining source does not, by itself, suffice." Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003). "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." Moss v.

Astrue, 555 F.3d 556, 561 (7th Cir. 2009); see 20 C.F.R. § 404.1527(c).

In this case, Dr. Masood completed two medical source statements. (R. 726-30, 756-60). In his first opinion, dated August 1, 2016, Dr. Masood listed Charles's diagnoses as cervicalgia, depression, and anxiety and stated that his symptoms included weakness in his arms and legs, numbness and tingling in his hands, frequent falls, and pain in his neck and lower back. *Id.* at 756, 757. Dr. Masood described Charles's pain as dull and sharp, occurring all the time in his neck and lower back, and movement making it worse and rated his pain as an eight out of ten. *Id.* at 756. In response to a question about the clinical findings and objective signs of Charles's condition, Dr. Masood wrote: "neck pain tenderness and lumbar spine tenderness." *Id.* Dr. Masood noted that Charles's pain or other symptoms would "constantly" interfere with his attention and concentration and that he was incapable of even "low stress" jobs because of severe pain in his neck and back. *Id.* at 757.

Dr. Masood opined that Charles could sit for less than two hours in an eight-hour work day and stand/walk for less than two hours in an eight-hour work day. (R. 758). He stated that Charles could sit for thirty minutes at a time, stand for fifteen minutes at a time, and walk one city block before needing to rest. *Id.* He further stated that Charles needed a ten-minute walking break every thirty minutes. *Id.* Dr. Masood also indicated that Charles needed to shift positions at will from sitting, standing, or walking and take unscheduled breaks every fifteen to thirty minutes. *Id.* He also recommended a cane or other assistive device for standing and walking. *Id.* at 759. Dr. Masood stated that prolonged sitting would require Charles to elevate his legs to hip level forty percent of the workday. *Id.* In addition, Dr. Masood opined that Charles can occasionally lift and carry

less than 10 pounds and rarely lift and carry 10 pounds. *Id*. Dr. Masood also noted that Charles can occasionally twist and climb stairs, rarely stoop (bend), and never crouch/squat and climb ladders. *Id*. Dr. Masood opined that Charles would have significant limitations with reaching, handling, and fingering. *Id*. at 760. In particular, Dr. Masood noted that Charles can use his hands to grasp, twist, and turn objects fifteen percent of the day. *Id*. Likewise, Charles can only use his fingers fifteen percent of the work day for fine manipulation. *Id*. Charles can only reach, including overhead, 20% of the workday. *Id*. Finally, Dr. Masood estimated that Charles would miss more than four days of work per month. *Id*.

A month later on September 2, 2016, Dr. Masood completed a second physical residual functional capacity questionnaire. Unlike his first questionnaire, which indicated that Charles's prognosis was good, Dr. Masood's second questionnaire indicates that Charles's prognosis was now fair. (R. 726, 756). Dr. Masood wrote that Charles's symptoms were neck pain and numbness in upper and lower extremities. *Id*. at 726. For clinical findings and objective signs, Dr. Masood indicated neck movement restricted and decreased sensation in upper and lower extremities. *Id.* Dr. Masood again noted that Charles's symptoms would constantly interfere with his ability to maintain concentration and limited his ability to sit to less than two hours total an eight-hour workday and to stand/walk less than two hours total in an eight-hour workday. *Id*. at 727, 728. Dr. Masood stated that Charles needs to shift positions at will from sitting, standing, or walking and recommended a cane or other walking device for sitting and standing. *Id*. at 728, 729. Dr. Masood opined that Charles could sit and stand for only ten minutes at a time. *Id*. at 728. He also opined that Charles would need frequent unscheduled breaks, which would last about fifteen minutes. *Id*. Dr. Masood changed his opinion from Charles needing to elevate his legs to hip level with

prolonged sitting to no requirement of Charles needing to elevate his legs. *Id*. at 729, 759. In addition, Dr. Masood now *opined* that Charles could never lift less than 10 pounds and never twist, stoop (bend), or climb stairs. *Id* at 729. Though he opined Charles would have significant limitations with reaching, handling, and fingering, the limitations were now not as restrictive as Charles was limited to using his hands, fingers, and arms sixty-percent of the workday. *Id*. at 730. Dr. Masood again predicted that Charles would need to be absent from work more than days per month as a result of his impairments. *Id*.

The ALJ assigned "little weight" to both opinions, claiming they were "inconsistent with the medical records." (R. 25). Based on the Court's review, the only inconsistency between Dr. Masood's opinions and the medical record identified by the ALJ is that Charles "repeatedly is noted as having normal or full muscle strength in his extremities." *Id*. The ALJ did not explain why evidence of normal muscle strength in Charles's extremities undermines Dr. Masood's limitations or how it is inconsistent with disabling pain. An "ALJ must … explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005). Without an explanation of how the ALJ reached his conclusion that Dr. Masood's opinions were inconsistent with Charles's normal muscle strength in his extremities, the ALJ failed to build the requisite "logical bridge" between the evidence and his rejection of Dr. Masood's opinions. *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011).

Moreover, Dr. Masood opined that Charles suffers not only from weakness in his extremities, but also suffers from severe and chronic pain. The ALJ did not point to any medical evidence indicating that muscle strength must be diminished as a result of severe pain**.** Rather, the ALJ appears to have improperly resorted to playing doctor when he found that evidence of full

strength in Charles's extremities was inconsistent with Dr. Masood's opinion on Charles's limitations and severe pain. *Fansler v. Astrue,* 2008 WL 474205, at *7 (N.D. Ind. Feb. 19, 2008) ("ALJ succumbed to the temptation to 'play doctor' when he independently concluded that normal muscle strength is inconsistent with chronic pain."); *see also Shank v. Comm'r of Soc. Sec.*, 2018 WL 417175, at *6 (N.D. Ind. Jan. 16, 1028) (criticizing the Commissioner for "playing doctor" by suggesting *post hoc* that the claimant's "normal muscle strength in his legs is somehow inconsistent with his experiencing chronic back pain"). Because normal muscle strength in Charles's extremities is the only alleged inconsistency the ALJ noted, the ALJ's decision not to give controlling weight to Dr. Masood's opinions on this basis is not supported by substantial evidence.

Even if the ALJ had given a "good reason" for not affording Dr. Masood's opinions controlling weight, the ALJ was still required to address the factors listed in 20 C.F.R. § 404.1527(c) to determine what weight to give the opinions. *See Yurt*, 758 F.3d at 860 ("ALJ should explicitly consider the details of the treatment relationship and provide reasons for the weight given to" treating physicians' opinions); SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996) (treating source medical opinions "are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527").[3]

The ALJ gave Dr. Masood's opinions "little weight" but failed to minimally address several of the regulatory factors which tend to support Dr. Masood's opinions. Specifically, other than acknowledging that Dr. Masood was Charles's treating physician, the ALJ did not

---

[3]     The SSA rescinded SSR 96-2p in connection with its new rules governing the analysis of treating physicians' opinions, but that rescission is effective only for claims filed as of March 27, 2017. *See* SSR 96-2p, Rescission of Social Security Rulings 96-2p, 96-Sp, and 06-3p, 2017 WL 3928298, at* 1 (March 27, 2017).

discuss the nature and extent of the treatment relationship, the frequency of examinations, the supportability of the decision, or whether Dr. Masood had a relevant specialty. The ALJ did not acknowledge that Dr. Masood was Charles's primary care physician specializing in internal medicine and had treated Charles for more than three and a half years. Notably, Dr. Masood saw Charles seventy times between November 14, 2013 and June 15, 2017 on an almost monthly basis and often more than once a month. (R. 566-635, 647-48, 687-98, 700-23, 753-55, 838-53, 864-70, 878-80, 882-900). Lastly, the ALJ did not address the supportability of Dr. Masood's opinion or properly analyze the consistency of Dr. Masood's opinion with the record. For example, the ALJ did not examine whether Dr. Masood's notes and records supported the findings in his opinions. As explained above, the ALJ's determination that Dr. Masood's opinions were inconsistent with Charles's normal muscle strength in his extremities is flawed. The ALJ was required to address these factors and explain how they impacted his decision to give little weight to Dr. Masood's opinions. *Schreiber v. Colvin*, 519 Fed. Appx. 951, 959 (7th Cir. 2013) (ALJ shall "sufficiently account[] for the factors in 20 C.F.R. § 404.1527"). Because the ALJ did not address these factors, the Court is unable to determine whether he properly assigned little weight to Dr. Masood's opinions. Accordingly, a remand is necessary for the ALJ to properly analyze and explain the weight to be afforded Dr. Masood's opinions in light of all the regulatory factors. *Campbell*, 627 F.3d at 308 (remanding where the ALJ failed to "explicitly address the checklist of factors as applied to the medical opinion evidence").

Likewise, the ALJ failed to specifically address the factors set forth in 20 C.F.R. § 404.1527 when he evaluated Dr. Singh's opinion. (R. 25-26). Dr. Singh opined that Charles could lift, push, and pull ten pounds maximum and should be restricted to minimum bending

and stooping. *Id*. at 766. The ALJ gave Dr. Singh's opinion "partial weight in part." *Id*. at 35. The ALJ accepted Dr. Singh's conclusion that Charles could lift, push, and pull ten pounds. *Id*. at 21, 25. The ALJ disregarded Dr. Singh's minimum bending or stooping limitation and instead, stated that he "accounted for these limitations by limiting bending/stopping to an occasional level." *Id*. at 26. The ALJ discredited Dr. Singh's bending/stooping limitation because "Dr. Singh provided no reason to limit the claimant to minimal bending/stooping," it is "not supported by the record as a whole," and "the term minimal is not defined by Dr. Singh." *Id*. at 25-26.

After declining to accord Dr. Singh's bending/stooping opinion controlling weight, the ALJ did not discuss the nature or length of Dr. Singh's treatment relationship with Charles, the frequency of his examinations, the consistency of Dr. Singh's opinion, and Dr. Singh's specialization. Several of these factors support giving significant weight to Dr. Singh's bending/stooping opinion. For example, Dr. Singh is a spine surgeon at Rush University Medical Center who operated on Charles's neck and back multiple times and saw him numerous times between at least September 2013 and March 2017. (R. 397-432, 458-509, 762-806). As to the supportability factor, the ALJ stated that Dr. Singh's bending/stooping opinion was "not supported by the record as a whole" but failed to identify anything in the record that did not support Dr. Singh's opinion. *Id*. at 26. Merely stating in a conclusory fashion that Dr. Singh's opinion is not supported by the record is insufficient to satisfy the ALJ's obligation to build an accurate and logical bridge from the evidence to his conclusion. *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) ("While an ALJ need not accept all of a doctor's recommendations and findings, she must—at minimum—build an accurate and logical bridge from the evidence to her conclusion.").

This case must be remanded for the ALJ to properly consider and weigh Dr. Singh's bending/stooping opinion. On remand, if the ALJ does not give controlling weight to Dr. Singh's opinion, he must articulate his consideration of the regulatory factors. Further, if the ALJ remains concerned that Dr. Singh provided no reason to limit Charles to minimum bending/stooping and failed to define the term "minimum," the ALJ shall recontact Dr. Singh. *See Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) ("If the ALJ's real concern was lack of backup support for Dr. Plascak's opinion," he had "a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable.").

**C.  Appropriate Remedy**

In light of the above errors, Charles argues that reversal and an award of benefits is the appropriate remedy here. When reviewing a denial of disability benefits, a court may "affirm, reverse, or modify the Social Security Administration's decision, with or without remanding the case for further proceedings." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011). When an ALJ's decision is not supported by substantial evidence, the Seventh Circuit has "held that a remand for further proceedings is the appropriate remedy unless the evidence before the court compels an award of benefits. *Briscoe ex rel. Taylor*, 425 at 355. Thus, an award of benefits is appropriate only where "all factual issues have been resolved and the 'record can yield but one supportable conclusion.'" *Id.* Because several factual issues remain unresolved in this case, including a reassessment of the RFC and Charles's subjective symptom allegations based on a fair and accurate evaluation of the record and a reevaluation and reweighing of the treating physician's and surgeon's opinions in accordance with treating physician rule and the factors set forth in 20 C.F.R. § 404.1527, the record does not conclusively support a finding of disability. A remand is required for the ALJ to more

thoroughly and accurately analyze the evidence and articulate his analysis.

### III. CONCLUSION

For the reasons and to the extent stated above, Plaintiff's Motion for Summary Judgment [13] is granted. The decision of the Commissioner is reversed, and the case is remanded for further expedited proceedings consistent with this Opinion. The Court notes that the Social Security Administration previously granted Charles's request for "critical case processing" and indicated that his case would receive "special expedited processing." (R. 183). The Court anticipates that the proceedings on remand will be similarly expedited.

**SO ORDERED.**

Dated: August 1, 2019

_____
Sunil R. Harjani
United States Magistrate Judge